IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                                Case No. 8:21-cv-02231

vs.

EDWARD LUBIN, M.D.,

    Defendant.

_____/

## THE UNITED STATES OF AMERICA'S
## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

The United States of America respectfully files its complaint against Dr. Edward Lubin under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and the common law to recover damages from false claims for prescriptions tainted by an illegal kickback arrangement that Dr. Lubin caused to be presented to the Medicare and TRICARE programs.

In or around 2013, Dr. Lubin, a pain management specialist practicing in Winter Haven, Florida, entered into an illegal kickback arrangement with Insys Therapeutics, Inc., and Dr. Lubin then submitted, or caused to be submitted, claims to the Medicare and TRICARE programs for prescriptions of Insys's sub-lingual fentanyl spray known as Subsys.  These prescriptions were not medically necessary, or were the result of an illegal kickback agreement, or both.

1

By knowingly submitting, or causing to be submitted, false claims for reimbursement, and by violating the Anti-Kickback Statute, Dr. Lubin violated the FCA.

## I.   Nature of the Action

1.     The United States brings this action to recover treble damages and civil penalties under the FCA.

## II.   Jurisdiction and Venue

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345.

3.     This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the acts committed by Dr. Lubin in violation of the FCA occurred in the Middle District of Florida, and because Dr. Lubin resides and transacts business in the Middle District of Florida.

4.     Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Dr. Lubin resides and transacts business in this District and a substantial part of the events giving rise to this action occurred in the Middle District of Florida.

## III.   Parties

5.     The United States brings this action on behalf of the U.S. Department of Health and Human Services (HHS), the Centers for Medicare & Medicaid Services (CMS), which administers the Medicare program, 42 U.S.C. §§ 1395 *et seq.*

(Medicare), and the Defense Health Agency (DHA), which administers the TRICARE program.

6.      Defendant Dr. Edward Lubin is a medical doctor currently practicing in Tampa, Florida.  From in or about 2013 through in or about 2017, Dr. Lubin practiced at the Gessler Clinic Professional Association in Winter Haven, Florida.

7.      Non-Party Insys Therapeutics, Inc. was a company incorporated in Delaware and headquartered in Arizona.  From 2013 through 2017, Insys manufactured and sold Subsys, a sub-lingual fentanyl spray.

**IV.   Subsys**

8.      Opioids are a therapeutic class of drugs used to relieve pain. Fentanyl is among the most potent opioids available for human use, and is classified as a Schedule II controlled substance under the Controlled Substances Act ("CSA"), meaning that it has a high potential for abuse.

9.      Fentanyl is a synthetic opioid that is 50 to 100 times more potent than morphine.

10.     Subsys was a liquid formulation of fentanyl to be applied under the tongue (a sub-lingual spray) allowing it to rapidly enter a patient's bloodstream.

11.     Subsys was in a category of drugs known as Transmucosal Immediate Release Fentanyl (TIRF), which included Subsys and other fentanyl-based rapid onset opioids. The only medically-accepted indication for TIRF drugs is for the management of breakthrough cancer pain in patients, over 18 years old, who were already receiving and tolerant to around-the-clock opioid therapy for their persistent

underlying cancer pain. Because of the risk of misuse, abuse, addiction, and overdose associated with TIRF drugs, including Subsys, the United States Food and Drug Administration (FDA) designed and mandated a TIRF Risk Evaluation and Mitigation Strategy (TIRF REMS). Among other things, the TIRF-REMS programs require that TIRF medicines only be dispensed to an outpatient when the practitioner prescribing the drug, the patient and the pharmacy dispensing the TIRF drugs are educated about the safe and effective use of TIRF drugs, including the risks and indications for TIRF drugs.

12.     In or around January 2012, the FDA approved Insys's application to sell and market Subsys to patients suffering from breakthrough cancer pain. Breakthrough cancer pain is a sudden, short-term increase in pain that may occur in patients who have chronic pain from cancer. The FDA approved Subsys solely for the "management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

13.     Subsys was sold in dosage strengths of 100, 200, 400, 600, 800, 1,200, and 1,600 micrograms.  Subsys, like other TIRF drugs, was expensive. Depending upon the dosage and number of units prescribed, a Subsys prescription usually cost thousands of dollars each month, and was often subsidized by federal health care benefit programs like Medicare or by commercial insurance.  To manage and control prescription costs, many insurers used pharmacy benefit managers (PBMs). Most

insurers required prior authorization before paying for TIRF medications like

Subsys.

## V.   The False Claims Act

14.    The FCA provides for the award of treble damages and civil penalties

for, among other things, knowingly presenting or causing the presentment of false or

fraudulent claims to the United States for payment or approval. 31 U.S.C.

§ 3729(a)(1)(A).

15.    The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval; . . .

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim;
. . .

is liable to the United States Government for a civil penalty of not less
than $5,000 and not more than $10,000, as adjusted by the Federal Civil
Penalties Inflation Adjustment Act of 1990 (20 U.S.C. 2461 note; Public
Law 104-410), plus 3 times the amount of damages which the
Government sustains because of the act of that person.

31 U.S.C. § 3729 (internal footnote omitted).[1]

16.    For purposes of the False Claims Act, the terms "knowing" and

"knowingly":

(A) mean that a person, with respect to information –

(i) has actual knowledge of the information;

---

[1] For conduct that occurred after November 2, 2015, civil penalties under the False Claims
Act are to be assessed at the inflation-adjusted amount set forth in 28 C.F.R. § 85.5.

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

17.     The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty per violation. 31 U.S.C. § 3729(a)(1).

## VI.     The Anti-Kickback Statute

18.     The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may corrupt professional healthcare decision-making, and may result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. H. Rep. No. 95-393, 95th Cong., 1st Sess. (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047. The AKS makes it a crime to offer or pay any remuneration in exchange for referrals in order to protect the integrity of Medicare, TRICARE, and other Federal health care programs. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142;

Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

19.     The AKS prohibits any person from soliciting or receiving any remuneration in return for referrals and offering or paying any remuneration in order to induce or reward referrals for services paid for under Federal health care programs. The statute provides in relevant part:

(b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item

for which payment may be made in whole or in part under a
Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not
more than $100,000 or imprisoned for not more than 10 years, or both. [2]

42 U.S.C. § 1320a-7b(b)(2).

20.     The AKS is violated if any one purpose of the remuneration is to induce
or reward referrals of Federal health care program business. *United States v. Greber*,
760 F.2d 68, 69 (3d Cir. 1985) ("if one purpose of the payment was to induce future
referrals, the [M]edicare statute has been violated."); *United States v. Davis*, 132 F.3d
1092, 1094 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989).

21.     In the Patient Protection and Affordable Care Act (ACA), Congress
intended to codify the pre-existing legal consensus "that all claims resulting from
illegal kickbacks are considered false claims for the purpose of civil action under the
False Claims Act, even when the claims are not submitted directly by the
wrongdoers themselves." 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010); *see also*
*United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (holding that under the pre-
ACA AKS, all claims resulting from illicit kickbacks constituted false claims under
the FCA); *see also United States ex rel. Capshaw v. White*, No. 3:12-CV-4457, 2018 WL
6068806, at *4 (N.D. Tex. Nov. 20, 2018).

---

[2] The Bipartisan Budget Act of 2018, Pub. L. No. 115-123, Section 50412, 132 Stat. 220 and
221, increased criminal penalties from not more than a $25,000 fine to not more than
a $100,000 fine, and increased the maximum imprisonment period from five years to ten
years. These penalties became effective upon enactment of the Act on February 9, 2018.

22.     A claim for reimbursement from a Federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. § 1320a-7b(g). Under this provision, claims submitted to Federal health care programs that result from violations of the AKS are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a)(1)(A)-(B). Accordingly, a person violates the FCA when he or she knowingly submits or causes to be submitted claims to federal health care programs that result from violations of the AKS.

23.     Specific intent is not required to establish a violation of the AKS. *See* 42 U.S.C. § 1320a-7b(h) ("With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.").

24.     Thus, claims that are submitted to Medicare, TRICARE, and other Federal health care programs in violation of the AKS are false or fraudulent under the FCA. See 42 U.S.C. § 1320a-7b(g) (incorporating FCA amendment clarifying that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act].").

25.     The United States Department of Health and Human Services Office of Inspector General (HHS-OIG) has promulgated "safe harbor" regulations that identify payment practices that do not violate the AKS because such practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Safe harbor protection

is afforded only to those arrangements that meet all of the specific conditions set forth in the safe harbor.

26.     One of the safe harbors promulgated by HHS-OIG involves personal services and management contracts. In order to qualify for protection under this safe harbor, the following conditions, among others, must be met: (1) The agreement is set out in writing; (2) The agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent; (3) The term of the agreement is for not less than one year; (4) The methodology for determining compensation paid to the agent is set in advance, consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals; and (5) the services performed under the agreement do not involve the promotion of a business arrangement.  42 C.F.R § 1001.952(d).

27.     As set forth in more detail below, Insys knowingly and willfully paid remuneration to Dr. Lubin to induce Dr. Lubin to prescribe Subsys to his patients, whether they needed it or not. Further, Dr. Lubin knowingly and willfully solicited and received remuneration from Insys in return for prescribing Subsys to his patients. Dr. Lubin's conduct does not fall within any safe harbor because the remuneration he received was (1) far in excess of fair market value; (2) was formulated and based on the value and dosage level of his referrals; and (3) accounted for the volume of his referrals to Insys.

10

### VII.   The Medicare Program

28.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A. Medicare is administered by CMS, an agency within HHS.

29.     The Medicare program consists of four parts: A, B, C, and D. Part B covers outpatient care, including physician services and ancillary services, such as clinical laboratory services, furnished by physicians and other providers and suppliers. 42 U.S.C. § 1395k. Part D provides prescription drug coverage. See 42 U.S.C. § 1395w-101, *et seq.*; 42 C.F.R. § 423.1, *et seq.* Part D prescription drug plans are administered by private insurance companies approved by the federal government and receive contributions from the federal treasury. 42 U.S.C. § 1395w-101, *et seq.*

30.     At all times relevant to this complaint, CMS contracted with private contractors called "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs") to perform certain administrative functions on CMS's behalf, including reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104, 421.200.

31.     To participate in the Medicare program, health care providers voluntarily enter into enrollment contracts with CMS in which the provider agrees to, among other things, satisfy all applicable statutory and regulatory requirements for Medicare payment, including certain provisions of Section 1862 of the Social

Security Act and Title 42 of the Code of Federal Regulations. Among the legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts concerning payment requests. 42 U.S.C. § 1320a-7b(a)(l) and (2); 42 C.F.R. § 1001.1552(a).

32.     Compliance with the AKS is a prerequisite for receiving payment from the Medicare program. For example, to qualify as a Medicare provider, physicians must certify on a Form CMS 8851 when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to [them]" and that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute. . .)." Dep't of Health & Human Servs., Medicare Enrollment Application: Physicians and Non-Physician Practitioners (CMS-855I), *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf.

**VIII.   Submitting Claims for Medicare Reimbursement**

33.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

34.     To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent, known as the 837 Professional's (837P) format. Among the information the provider or supplier includes on a CMS 1500 or

through the 837P format are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the NPI of the "rendering provider" and the "referring provider or other source."

35.     When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information on the claim form is "true, accurate, and complete"; and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." After a February 2012 revision to the CMS 1500, providers further certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as the Stark Law)." CMS 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

36.     Similarly, when enrolling to submit claims electronically, providers certify that they will submit claims that are "accurate, complete, and truthful."

13

https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10164B.pdf.

37.   Health care providers are prohibited from knowingly presenting or causing to be presented claims for items or services that the person knew or should have known were not medically necessary, or knew or should have known were false or fraudulent. 42 U.S.C. §§ 1320a-7a(a)(1); 1320a-7(b)(7) (permitting exclusion of providers for the foregoing violations).

38.   A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

## IX.   Medicare Part D

39.   In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of the Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

40.   Unlike coverage in Medicare Part B, Part D coverage is not provided within the traditional Medicare program. Medicare Part D is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans. A Part D Plan Sponsor may be

either a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan, a Program of All-inclusive Care for the Elderly (PACE) organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

41.     Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. The Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D Sponsors, in turn, enter into subcontracts with pharmacies or other downstream entities to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

42.     Generally, after a physician writes a prescription for a Medicare Part D beneficiary, that patient can take the prescription to a pharmacy (or submit it to a mail order specialty pharmacy) to be filled.

43.     When a pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Plan Sponsor (sometimes through a pharmacy benefit manager (PBM)) and receives reimbursement from the Part D Plan Sponsor (or the PBM) for the portion of the drug cost not paid by the Part D beneficiary.

44.     The Part D Plan Sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a Prescription Drug Event

15

(PDE) record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy.

45.     Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program. The data contained in PDEs are data related to payment of claims. The Integrated Data Repository process date is the date when the PDE is transmitted to CMS, such that CMS is informed of the PDE by the Part D Plan Sponsor.

46.     CMS conditions Medicare Part D program participation and payment upon the disclosure and provision of information needed to carry out payment. This information includes PDE data. The submission of PDE claims data to CMS is a material condition of payment for CMS's provision of Medicare funds to Part D Plan Sponsors. *See* 42 C.F.R. § 423.322.

47.     Throughout the year, CMS makes prospective payments to Part D Plan Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

48.     The direct subsidy (a monthly capitated payment) is paid to the Part D Plan Sponsor "in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. § 423.329(b), minus the monthly beneficiary premium as determined in 42 C.F.R

§ 423.286." 42 C.F.R. § 423.315(b). In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan.

49.     CMS also makes payments to the Part D Plan Sponsor for premium and cost sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 42 C.F.R. § 423.782. Cost-sharing subsidies for qualifying low-income individuals are called "Low-Income Cost Sharing Subsidies" and are documented and reconciled using PDE data submitted to CMS.

50.     Part D sponsors who fail to submit required claims-level information contained in the PDE to CMS risk having to return the monthly payments to CMS during reconciliation. *See* 42 C.F.R. §§ 423.343(b), (c)(2) and (d)(2). In addition, Part D Sponsors are responsible for correcting submitted PDE data they determine are erroneous.

51.     After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

52.     In order to receive Part D funds from CMS, Part D Plan Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable federal laws and regulations, as well as CMS instructions. By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Part D Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program, as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112. Further, CMS regulations

17

expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act and AKS. *See* 42 C.F.R. § 423.505(h)(1).

53.     CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities, including pharmacies, contain language obligating the dispensing pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

54.     Medicare Part D only pays for drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act, or a use which is supported by one or more citations included or approved for inclusion in one of the specified compendia. 42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i)& (k)(6); 42 C.F.R. § 423.100.

55.     Medicare Part D only pays for drugs that are dispensed upon a valid prescription. 42 U.S.C. § 1395w-102(e); 42 C.F.R. § 423.100. A "Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). A valid prescription must comply "with all applicable State law requirements constituting a valid prescription." 42 C.F.R. § 423.100.

56.     Moreover, prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as recreational use, are not for "medically

18

accepted indications" and are therefore not covered Medicare Part D drugs. 42

USCA § 1395w-102(e)(1); 42 C.F.R. § 423.100.

57.     All prescriptions for controlled substances are required to be dated as of,

and signed on, the day when issued and to bear the full name and address of the

patient; the drug name; strength; dosage form; quantity prescribed; directions for use;

and the name, address, and registration number of the practitioner. 21 C.F.R.

§ 1306.05(a).

58.     Part D plans may also exclude drugs from payment if the drugs are not

reasonable and necessary for the diagnosis or treatment of illness or injury or to

improve functioning of a malformed body part. 42 U.S.C. § 1395w-102(e)(3)

(incorporating by reference 42 U.S.C. § 1395y(a)).

59.     During the relevant time period, Dr. Lubin wrote prescriptions for

Subsys for Part D beneficiaries that were filled by pharmacies and paid for by

Medicare.

## X.   TRICARE

60.     TRICARE is a program of medical benefits provided by the United

States Government, under public law to specified categories of individuals who are

qualified for these benefits by virtue of their relationship to one of the seven

Uniformed Services. TRICARE is intended to "provid[e] an improved and uniform

program of medical and dental care for members and for certain former members of

those services, and for their dependents."  10 U.S.C. § 1071. The funds used by

TRICARE to pay medical claims of qualified individuals are appropriated funds. 32 C.F.R. § 199.1(e).

61.     The Director of DHA is responsible for making such arrangements as are necessary to adjudicate and process claims. *Id*. 199.1(f). In providing civilian healthcare for its beneficiaries, TRICARE processes claims from civilian providers primarily through Managed Care Support Contractors (MCSCs). 32 C.F.R. § 199.17(a)(1). The MCSCs negotiate special arrangements with civilian sector health care providers which are known as "network agreements."

62.     Prior to January 1, 2018, there were three TRICARE MCSCs with distinct geographical regions in which each contractor was responsible for providing administrative support to the Department of Defense.  The three regions were designated in contracts as North, South, and West.  Effective January 1, 2019, the three existing MCSCs were transitioned into two newly awarded MCSCs.

63.     Humana Military was the MCSC for the TRICARE South Region, of which the State of Florida was a part, from 2003 through 2018. Humana Military currently is the MCSC for the TRICARE East Region. For all times relevant to this complaint, Humana Military contracted with PGBA, LLC (PGBA), a private claims processing business, to receive and process claims on its behalf received from civilian providers.

64.     TRICARE covers only medically necessary inpatient and outpatient care. TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and

treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (in duration or intensity) the level of care which is needed to provide safe, adequate, and appropriate diagnosis and treatments. *See* 32 C.F.R. § 199.4(a)(1)(i) and applicable definitions at 32 C.F.R. § 199.2.

65.     TRICARE regulations also provide that TRICARE may deny payment in "abuse situations." 32 C.F.R. § 199.9(b). To avoid abuse situations, providers are obligated to provide services and supplies under TRICARE that are: "Furnished at the appropriate level and only when and to the extent medically necessary . . .; of a quality that meets professionally recognized standards of health care; and, supported by adequate medical documentation as may reasonably be required under this part . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." *Id.*

66.     The TRICARE regulations, in turn, define "appropriate" medical care as that which is, *inter alia*, "[f]urnished economically"—i.e., "in the least expensive level of care or medical environment adequate to provide the required medical care." 32 C.F.R. § 199.2.

67.     TRICARE also offers its beneficiaries a prescription drug benefit. TRICARE beneficiaries may receive prescription drugs from three different sources:

military treatment facilities, the TRICARE Mail Order Pharmacy, and retail pharmacies.

68.     TRICARE will only pay "for medically necessary prescription drugs required in the treatment of an illness or injury or in connection with maternity care. . . . However, TRICARE benefits cannot be authorized to support or maintain an existing or potential drug abuse situation whether or not the drugs (under other circumstances) are eligible for benefit consideration and whether or not obtained by legal means." 32 C.F.R. § 199.4.

69.     As with Medicare, providers submit claims to TRICARE using the CMS 1500 or an electronic equivalent. Providers therefore make the same certifications in submitting claims to TRICARE as they do when submitting claims to Medicare.

70.     During the relevant time period, Dr. Lubin wrote prescriptions for Subsys for TRICARE beneficiaries that were filled by pharmacies and paid for by TRICARE.

XI.     **Insys's fraudulent speaker program**

71.     Insys manufactured and marketed Subsys, a sub-lingual Fentanyl formulation that was approved by the FDA to treat breakthrough cancer pain.

72.     Insys perpetuated a sham speaker program, in which the goal was to funnel as much money as possible to doctors who prescribed high quantities of Subsys as a reward for their prescriptions.

22

73.     Insys was prosecuted under a criminal information filed in the United States District Court for the District of Massachusetts in June of 2019. *See United States v. Insys Therapeutics, Inc. et al.*, Case No. 1:19-cr-10191-RWZ, DE 1 ("The Insys Case").

74.     Insys entered into a deferred prosecution agreement, which included a Statement of Facts wherein Insys confirmed the following information:

a.  Beginning in August 2012 and continuing until June 2015, Insys paid bribes to certain practitioners as part of a scheme to defraud patients and insurers, including Medicare. Insys paid the bribes in order to induce certain practitioners to write unnecessary Subsys prescriptions.

Insys Case, DE 3 at 13, ¶ 8.

b.  Insys paid bribes to certain practitioners to prescribe Subsys through its Speaker Program. The Speaker Program was a marketing program that purported to increase brand awareness of Subsys by sponsoring peer-to-peer educational lunches and dinners. Purportedly in exchange for a practitioner educating other prescribers about Subsys, Insys agreed to pay the speaker a fee, also referred to as an "honoraria," for each speaking event.

*Id.* at 13-14, ¶ 10.

c.  The Speaker Program included certain speaker practitioners who had the potential to prescribe Subsys, and was used to induce them to write more, medically unnecessary prescriptions in exchange for payment of

23

money by Insys in the form of honoraria. Insys fashioned the payments to these certain practitioners as speaker fees, or honoraria, in order to hide the fact that they were in fact bribes paid to induce certain practitioners to write Subsys prescriptions.

*Id.* at 14, ¶ 11.

75.    In the deferred prosecution agreement, Insys admitted that the Speaker Program events "did not have attendees who were licensed to prescribe Subsys," that many speaker events had no attendees at all, and that Insys sales representatives were authorized "to falsify the names of attendees and their signatures." *Id.* at 14, ¶ 12.

76.    The agreement further states: Insys employees "expressly required a practitioner to write a minimum number of Subsys prescriptions, write prescriptions at a minimum dosage, and write prescriptions for a minimum number of units of Subsys, in order for the speaker to continue receiving the bribe, that is, the so-called honoraria, for sham events." *Id.* at 14, ¶ 13.

77.    The agreement also states that if a speaker in the program, such as Dr. Lubin, failed to meet minimum prescription requirements, Insys took Speaker Program payments away from practitioners or reduced the total volume of Speaker Program payments paid to practitioners. *Id.* at 15, ¶ 13.

78.    Insys's CEO and President, Michael Babich, pled guilty to conspiracy to bribe as part of the criminal charges brought by the District of Massachusetts against Insys executives.  At trial, Mr. Babich testified against the other defendants.

24

79.     Babich testified that VP of Sales Alec Burlakoff worked to direct funds

to doctors who prescribed Subsys:

> Q. And what is Mr. Burlakoff referring to there, if you know?
> A. He's referring to the fact that we have a budget for 2012 remaining
> and he would take the budget and put it in the hands of doctors that
> have proven that they can provide us with the return on investment.
> That is very positive.
> Q. Doctors -- are we talking about speakers, attendees? Did he explain
> that?
> A. The speakers.

*USA v. Gurry et al.*, Case No. 16-CR-10343-ADB, District of Massachusetts, Day 18,
20:6-14.

80.     Babich understood the speaker program was used to pay doctors cash in

exchange for writing Subsys prescriptions:

> Q. What was your understanding of "your local speaker should be your
> business partner"?
> A. That they should write scripts in exchange for the honorarium that
> they would be receiving as speakers.

*USA v. Gurry et al.*, Case No. 16-CR-10343-ADB, District of Massachusetts, Day 18,
29:5-9.

81.     Babich testified that the purpose of the speaker program was to funnel

money to doctors:

> Q. So you understood him to be telling you -- this is Matt Napoletano
> [former head of marketing] telling you and John Kapoor [Insys founder
> and chairman] that he believed you should have these speaker programs
> because you could pay them to prescribe?
>
> A. He said it's a way to get money in their pocket, and then they're
> going to write more product.

*USA v. Gurry et al.*, Case No. 16-CR-10343-ADB, District of Massachusetts, Day 19,
page 173-73, line 25-3.

25

82.     Babich testified that Insys founder and Chairman John Kapoor tracked the return on "investment" Insys was receiving for the doctors it paid in the speaker program:

> A. I'm referring to the document that John Kapoor wanted a return on investment document done for our speaker programs.
> Q. What kind of return on investment?
> A. He wanted to see how successful our speakers were and how much product they were writing, based on how much money we had given them so far.

*USA v. Gurry et al.*, Case No. 16-CR-10343-ADB, District of Massachusetts, Day 18, page 103:16-23.

83.     Karen Hill was originally a sales representative for Insys who was promoted to sales director.

84.     Hill pleaded guilty to conspiracy to pay kickbacks.

85.     According to Hill's plea agreement, she managed sales representatives, "who persuaded doctors to prescribe Subsys through, among other means, payments made for participating in Insys Speaker Programs."

86.     Hill admitted in her plea agreement that she conspired to orchestrate the systematic payment of kickbacks to doctors in the Miami Region, which included doctors in the Middle District of Florida, "in exchange for those doctors prescribing Subsys."

87.     Dr. Lubin was one of the doctors in the Miami Region of the Insys Speaker Program.

88.     In her plea agreement, Hill confirmed the Insys speaker program was a "means by which the company could put extra money in the pockets of high-prescribing doctors" in exchange for prescribing Subsys.

89.     In a deposition, Dr. Lubin testified under oath that he knew Karen Hill and that Hill even visited his office.

90.     During his trial testimony, Babich described Insys "whales."

Q. All right. And you talked about the whales, the top --who are they, what are they?
A. The whales were the. . .They were the physicians that we knew that, if you gave them money, their scripts would go up. . . . So the whales were the ones that really kept our business afloat.

*USA v. Gurry et al.*, Case No. 16-CR-10343-ADB, District of Massachusetts, Day 22, 14:25-15:10.

91.     According to Hill, Dr. Lubin was a "whale" for Insys.

92.     Alec Burlakoff was the VP of Sales at Insys during the time Dr. Lubin participated in the Speaker Program.

93.     Burlakoff had sales reps send him pictures of doctor's offices with their luggage, indicating how much time they were spending at the doctor's offices.

94.     Sales Representative BW was the representative assigned to Dr. Lubin. Sales Representative BW reported directly to Karen Hill.  In one email to Hill, Sales Representative BW bragged, "The Lubin-ator is killing it!"  BW told Hill that BW had her own desk in the nurses room at Dr. Lubin's office and she "did breakfast/lunch everyday."

95.     Three weeks after Sales Representative BW sent this email in March 2014, Insys entered into a new speaker agreement with Dr. Lubin, increasing his payouts up to $2,200 per speaker program.

## XII.   Dr. Lubin's Fraudulent Conduct

96.     Dr. Lubin participated in the sham speaker program with Insys.  He did this by repeatedly accepting payments for sham "events" that were not presentations, but in reality were five-minute, impromptu conversations without any substance at all.

97.     Dr. Lubin was paid thousands of dollars for these "events."

98.     Worse, Dr. Lubin also accepted thousands of dollars in payments for events that never occurred.

99.     In or about August 2013, Insys Sales Representative BW nominated Dr. Lubin to be part of the Insys speaker program.

100.    Dr. Lubin entered into a "Speaker Agreement" with Insys, which he signed September 10, 2013:



**SPEAKER AGREEMENT**

THIS SPEAKER AGREEMENT (the "Agreement"), is entered into as of September 10, 2013 ("Effective Date"), by and between INSYS Therapeutics, Inc. , a Delaware corporation ("INSYS"), and Edward Lubin, MD an individual ("Speaker").

WHEREAS, INSYS wishes to obtain the services of Speaker for certain purposes, and Speaker wishes to provide such services, all subject to the terms and conditions of this Agreement.

Name: Edward Lubin, MD

Initial:

Date: 9/10/13

101.    The next day, Medicare received Dr. Lubin's first prescription for Subsys.

102.    During the time he participated in the Insys speaker program, Dr. Lubin was paid between $1,600 and $3,700 per "speech." Nominally, Dr. Lubin was supposed to educate other medical provides about Subsys' characteristics.

103.    In reality, Dr. Lubin was participating in sham speaker events designed to funnel him payments for writing prescriptions of Subsys.

104.    Dr. Lubin gave "speeches" where no physician was present; he provided "presentations" to non-physicians that lasted only five minutes; and he accepted payment for "speeches" that never occurred.

29

105.    Between 2013 and 2016, Dr. Lubin received payments from Insys totaling approximately $159,580.

106.    During his time as an Insys "speaker," 99% of Dr. Lubin's TIRF prescriptions were written for Subsys.  He wrote over 500 prescriptions for Subsys and only four prescriptions for an alternative TIRF medication, called Lazanda.

107.    From 2013 through 2017 the top three drugs prescribed by Dr. Lubin were all sub-lingual fentanyl spray; the only difference was the dosage.  The Part D Medicare costs for these prescriptions exceeded $2.8 million.

**Dr. Lubin presented to non-physicians**

108.    Dr. Lubin gave numerous sham presentations to justify his payments from Insys.  These included sham presentations delivered to non-physicians.

109.    By way of example, one such event was a presentation to Pharmacist A.[3]  Pharmacist A attended a presentation given by Dr. Lubin.  This presentation occurred after-hours, at a local Italian restaurant named Arabella's.  Pharmacist A said there was a sign-in sheet, about ten attendees, and the event's discussion centered on the use of Subsys as opposed to similar drugs being used in a patch.  He recalled the event was not worth his time.  This was the only after-hours event he was asked to attend.

110.    Had this presentation been given a room full of physicians who could prescribe Subsys, for the purposes of education, it might have been legitimate.

---

[3] Names of non-party witnesses are redacted to protect the witnesses' identity.  The United States can provide identifying information in discovery.

111.    But rather than stop there, Dr. Lubin's conduct became more egregious.

112.    Dr. Lubin then came to Pharmacist A's pharmacy multiple times. These visits lasted only 15 minutes.  Pharmacist A stressed these were visits and not presentations.  Despite this, Dr Lubin and Insys treated these as legitimate speaking events worth thousands of dollars.

113.    Notably, Insys generated and kept forged sign-in sheets from these events to justify the sham payments to Dr. Lubin.  The sign-in sheets are forged because Pharmacist A's signature is duplicated:



These excerpts, above, from three sign-in sheets purportedly signed by Pharmacist A reveal the exact same signatures, with the exact same annotation "NO FOOD," with only the date changed.  Even the top of the form is duplicated, all occurring at "12:00pm," in the exact same writing.  The forms dated April 8 and April 23, 2014, even include the same error in Dr. Lubin's name.

31

114.    In fact, a total of five sign-in sheets bear the exact same signature of Pharmacist A, but these are duplications of the signature on forms that Pharmacist A did not sign.  These presentations by Dr. Lubin, all delivered to the same non-physician, supposedly occurred on the following dates:

April 9, 2014

April 23, 2014

August 20, 2014

September 3, 2014

September 24, 2014.

115.    It is no surprise that Dr. Lubin and Sales Representative BW attended so many presentations at pharmacies, because Insys authorized presentations at pharmacies as a faster and cheaper way to funnel cash to doctors in exchange for prescribing Subsys.

116.    Insys CEO Babich testified that Insys VP of Sales, Alec Burlakoff, pushed for less formal events to push even more money to speakers like Dr. Lubin:

> Alec started to talk about we shouldn't be doing speaker dinners, we should start to do speaker breakfasts and speaker lunches and speaker pharmacy calls, because it would be a still—a way to pay the doctor, but also a lot cheaper, because you wouldn't have a steak dinner attached to it. And it's most important that you just give the doctor the money, that who cares about the attendees.
> . . .
> Q. And so what happened? Well, first of all, how do you know that John wanted to hear more about his plan?
> A. Because he told him to keep going.
> Q. Okay. What happened next?
> A. We ended up allowing speaker programs to be done at breakfast, lunches, and also pharmacy calls counted as speaker programs, as well.

*USA v. Gurry et al.*, Case No. 16-CR-10343-ADB, District of Massachusetts, Day 18, page 30:2-9, 18-24.

117.   As another example, Dr. Lubin was paid for a sham presentation supposedly delivered to Pharmacist B. Pharmacist B was previously the pharmacist at the Legoland Publix, but later moved to be the Pharmacist in Charge at the Publix Pharmacy located at 884 Cypress Gardens Boulevard in Winter Haven, FL.

118.   According to Insys records, Dr. Lubin presented to Pharmacist B, based on the sign-in sheet below.  But Pharmacist B stated that she did not recall ever attending any presentation on Subsys.



119.   Pharmacist B also did not recall seeing this document or signing it and stated that none of the information was filled in by her.  She stated that Dr. Lubin falsely used her signature.

33

120.    Pharmacist B recalled meeting Dr. Lubin one time, when he made an unannounced visit to the Legloland Publix and spoke with her briefly. Pharmacist B confirmed that Publix employment records show her working at the Legoland Publix on March 20, 2014, not the Winter Haven Publix listed on the Insys form.

121.    Additionally, the Winter Haven Publix Pharmacist Log-In confirms that Pharmacist B was not the pharmacist on duty at the Winter Haven Publix on March 20, 2014.

122.    It was not possible for Dr. Lubin to have presented to Pharmacist B at the Winter Haven Publix on March 20, 2015.

123.    Despite this, Dr. Lubin received a $1,600 payment from Insys for the sham event that could not have occurred on March 20, 2014:

| Mar 20, 2014 | $1,600 | SUBSYS | Promotional Speaking/Other | INSYS Therapeutics Inc |

**Insys Reprimanded Dr. Lubin's Sales Representative for Duplicating Signatures**

124.    Sales Representative BW accompanied Dr. Lubin on many of his sham speaking events.

125.    Upon information and belief, Sales Representative BW manipulated the signatures on the Insys sign-in sheets for Dr. Lubin's sham speaking events.

126.    BW's behavior was so egregious that Insys reprimanded her for duplicating signatures in November of 2014:

34



127.    The Insys "Letter of Warning" stated that, in September and October 2014, during an event at Dr. Lubin's office, BW photocopied a sign-in sheet and used it for future events held in the office, "only changing the date at the bottom of the sheet."

128.    In reality, this letter was meant to cover Insys for Sales Representative BW's fraudulent copying of signatures, even though Insys did not care about this practice.

129.    Most importantly, Insys did not discipline Sales Representative BW beyond the letter, because she was "very honest and forthcoming."

130.    In fact, either Insys did not care or BW did not disclose that she and Dr. Lubin were attending sham speaking events and that she was duplicating pharmacists' signatures on sign-in sheets.

131.    Rather than correct her actions, Sales Representative BW continued falsely duplicating signatures after November 11, 2014.

**Dr. Lubin was paid for events that never occurred**

132.    Pharmacist C met Dr. Lubin once when he accompanied an Insys sales representative on a trip to her pharmacy.  Pharmacist C thought it was odd for a doctor to accompany a pharmaceutical sales representative, because that had never occurred before.

133.    According to Pharmacist C, the meeting with Dr. Lubin was not pre-planned and lasted only five minutes.  There was no formal presentation during the meeting.  In fact, Dr. Lubin did not even go to the back offices in the pharmacy; the conversation occurred in the general patient area.

134.    Pharmacist C did not recall signing any documents provided by Insys and never attended a speaker program.

135.     Despite these facts, Dr. Lubin was paid for two Insys speaking events with Pharmacist C, which supposedly occurred on January 8, 2014, and January 28, 2015.



136.    Pharmacist C stated the signature on a January 28, 2015 form was not hers and confirmed none of the handwriting on the document was hers.  Because she only met Dr. Lubin one time, it is not possible that this second event occurred at all.

137.    Despite the fact that the first "event" was a sham and the second never occurred, Dr. Lubin was paid $2,200 for each of these "events."

138.    Dr. Lubin's received payments are shown by tracking the "program number" used by Insys to track its speaker payments. The January 8 "event" includes the program number handwritten at the top:



139.    Insys tracked the event on its internal form.  The form lists the same program number as the sign-in form: 8032JA0815E.  Shockingly, Insys planned for this five-minute event to last for two hours.

140.    After the event ostensibly occurred, Insys then processed the $2,200

check request with the same program number and paid Dr. Lubin:



141.    The same sham records were processed for the January 28, 2015,

"event" with Pharmacist C using Program Number 8032JA2815E:

**Dr. Lubin was paid for a meeting that Insys knew never occurred**

142.    Finally, Pharmacist D provides two examples of Dr. Lubin receiving payments for events that he did not attend because they never occurred.

143.    Pharmacist D was a part-time pharmacist at Winter Haven Pharmacy. This is the same pharmacy where Dr. Lubin received $2,200 for each event with Pharmacist C.

144.    Pharmacist D confirmed he never met or spoke with Dr. Lubin.  He could not recall any instance when a doctor visited a pharmacy with a sales representative.  Despite this, Insys has duplicated sign-in sheets dated April 22 and October 13, 2014 when Dr. Lubin supposedly presented to Pharmacist D at Winter Haven Pharmacy.

145.    As with other Insys sign-in sheets, these forms use the exact same signature:

146.    Pharmacy records confirm Pharmacist D was not working at Winter

Haven Pharmacy on October 13, 2014.  Despite this, Insys paid Dr. Lubin $2,200 for

this sham "event":

Program Name: Advancements in the Treatment of Breakthrough Pain in Cancer Patients
Program Date: October 13, 2014
Program Location: Winter Haven, FL
Program Number: 8025OG1314E


Dear Dr. Lubin:

We would like to thank you for speaking on behalf of Subsys®.  Enclosed please find a check made payable to
you for the amount of $2200.00.  This covers your compensation for the above speaking engagement.

147.    Insys's own records show the event on April 23 never occurred.  The

sign-in sheet showed an event on April 23:



148.    But Insys emails show Sales Representative BW herself emailed and

cancelled the event, emailing, "I need to cancel 04/24 program Winterhaven

pharmacy" [sic] and then confirming she actually meant April 23:



149.   Dr. Lubin was paid $2,400 for this cancelled "lunch" event.

150.   Insys provided Lubin other sales representatives who assisted him in getting paid for Sham events, including Sales Representatives AS and LL.

151.   Lubin attended sham events in Miami and Merritt Island, Florida, and was paid thousands of dollars for these sham events, including travel expenses.

**Many of Dr. Lubin's patients never had cancer and did not need Subsys**

152.   From 2014 through 2016, Dr. Lubin prescribed Subsys to 61 patients.

153.   Only nine of those patients had cancer.

154.   It appears Dr. Lubin improperly prescribed Subsys to patients for whom Subsys was not medically necessary or appropriate because they did not have cancer, let alone breakthrough cancer pain.

155.   The following patients serve as exemplars of Dr. Lubin's patients who did not have cancer, but were prescribed Subsys by Dr. Lubin.

156.   Patient 1 was prescribed Subsys by Dr. Lubin.  Patient 1 has never been diagnosed with cancer and has never been tested for cancer. Despite this, Dr. Lubin insisted Patient 1 see another doctor who referred Patient 1 to an oncologist.  Patient 1 suspects Dr. Lubin was trying to cover his tracks and explain his prescription of Subsys.

157.   Medicare records show Patient 1 was prescribed Subsys by Dr. Lubin multiple times and claims for those prescriptions were received by Medicare on or about September 22, 2014; October 20, 2014; November 17, 2014; December 17, 2014; and January 15, 2015.

41

158.   Patient 2 has never been diagnosed with cancer.  Dr. Lubin prescribed this patient Subsys in addition to a fentanyl patch.  Dr. Lubin steadily increased Patient 2's dosage of Subsys from 400mcg, to 600mcg, to 800mcg, and finally to 1200mcg.  Medicare records show Patient 2 was prescribed Subsys by Dr. Lubin multiple times and claims for those prescriptions were received by Medicare on or about September 18, 2015; December 29, 2015; June 16, 2016; July 26,2016; and September 7, 2016.

159.   Julia Key was prescribed Subsys by Dr. Lubin but, as with most of Dr. Lubin's patients, she never had a cancer diagnosis.  She went so far as to sue Dr. Lubin in 2018 for medical negligence for prescribing her Subsys.  *Key v. Lubin, et al.*, Polk County, Florida, Case No. 2018-CA-001229, filed April 12, 2018.  The case settled out of court in 2019.

**Exemplar Patients who were prescribed Subsys after sham speaking events**

160.   Dr. Lubin submitted, or caused to be submitted, false claims to federal healthcare programs for Subsys.  The claims for these prescriptions totaled millions of dollars.  The following claims serve as exemplar claims for the purposes of this complaint; there are many more false claims caused by Dr. Lubin.

161.   As detailed above, Dr. Lubin was paid for a sham speaking event that supposedly occurred on March 20, 2014.  In the two weeks following that date, Medicare received claims for the following Subsys prescriptions written by Dr. Lubin:

42

| Patient Identifier | Date Claim Received | Drug Name | Product Description | Prescriber | Amount |
|---|---|---|---|---|---|
| Patient A | 3/27/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $3,544.66 |
| Patient B | 3/27/2014 | SUBSYS | SUBSYS SPR 400MCG | LUBIN, EDWARD | $6,852.42 |
| Patient C | 3/31/2014 | SUBSYS | SUBSYS SPR 800MCG | LUBIN, EDWARD | $11,166.38 |
| Patient D | 4/1/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $3,635.45 |

162. As detailed above, Dr. Lubin was paid for a sham speaking event that supposedly occurred on April 23, 2014. In the two weeks following that date, Medicare received claims for the following Subsys prescriptions written by Dr. Lubin:

| Patient Identifier | Date Claim Received | Drug Name | Product Description | Prescriber | Amount |
|---|---|---|---|---|---|
| Patient E | 4/30/2014 | SUBSYS | SUBSYS SPR 400MCG | LUBIN, EDWARD | $6,981.49 |
| Patient B | 5/1/2014 | SUBSYS | SUBSYS SPR 400MCG | LUBIN, EDWARD | $6,875.16 |
| Patient F | 5/5/2014 | SUBSYS | SUBSYS SPR 400MCG | LUBIN, EDWARD | $6,981.49 |
| Patient G | 5/5/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $4,809.82 |

163. As detailed above, Dr. Lubin was paid for a sham speaking event that supposedly occurred on October 13, 2014. In the two weeks following that date, Medicare received claims for the following Subsys prescriptions written by Dr. Lubin:

| Patient Identifier | Date Claim Received | Drug Name | Product Description | Prescriber | Amount |
|---|---|---|---|---|---|
| Patient C | 10/14/2014 | SUBSYS | SUBSYS SPR 800MCG | LUBIN, EDWARD | $11,892.69 |
| Patient H | 10/15/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,028.85 |
| Patient I | 10/20/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,028.85 |
| Patient J | 10/20/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,122.00 |
| Patient K | 10/20/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $4,260.87 |
| Patient G | 10/23/2014 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,121.85 |

164. After the sham speaking event on October 13, 2014, TRICARE

received the following claims for Subsys prescriptions written by Dr. Lubin:

| Patient Identifier | Date Written | Date Dispensed | Brand Name | Drug, Strength, Form | Provider Name | Submitted Amount Due |
|---|---|---|---|---|---|---|
| Patient L | 10/13/2014 | 10/13/2014 | SUBSYS | fentanyl 400MCG /SPR SPRAY | LUBIN, EDWARD MD | $7,392.10 |
| Patient M | 10/20/2014 | 10/28/2014 | SUBSYS | fentanyl 800 MCG SPRAY | LUBIN, EDWARD MD | $11,833.31 |
| Patient N | 10/27/2014 | 10/29/2014 | SUBSYS | fentanyl 600 MCG SPRAY | LUBIN, EDWARD MD | $9,562.91 |
| Patient O | 11/11/2014 | 11/11/2014 | SUBSYS | fentanyl 1200 MCG SPRAY | LUBIN, EDWARD MD | $19,221.95 |

165.    Dr.  Lubin was paid for a sham speaking "event" with Pharmacist C that supposedly occurred on January 28, 2015.  Dr. Lubin's check was dated February 2, 2015, in the amount of $2,200 for this sham event.  *See* Paragraph 141, above.

166.    Dr. Lubin wrote three prescriptions for Subsys on February 9, 2015, a week after his check was issued.  These claims were submitted to TRICARE and TRICARE paid the following amounts:

| Patient Identifier | Date Written | Date Dispensed | Brand Name | Drug, Strength, Form | Provider Name | Submitted Amount Due |
|---|---|---|---|---|---|---|
| Patient L | 02/09/2015 | 02/09/2015 | SUBSYS | fentanyl 600 MCG SPRAY | LUBIN, EDWARD MD | $10,513.53 |
| Patient M | 02/09/2015 | 02/10/2015 | SUBSYS | fentanyl 1200 MCG SPRAY | LUBIN, EDWARD MD | $21,046.66 |
| Patient N | 02/09/2015 | 02/12/2015 | SUBSYS | fentanyl 400MCG /SPR SPRAY | LUBIN, EDWARD MD | $8,059.34 |

167.    Similarly, in the two weeks following the January 28, 2015, sham event, Medicare received the following Subsys prescriptions written by Dr. Lubin:

| Patient Identifier | Date Claim Received | Drug Name | Product Description | Prescriber | Paid Amount |
|---|---|---|---|---|---|
| Patient P | 1/28/2015 | SUBSYS | SUBSYS SPR 600MCG | LUBIN, EDWARD | $8,477.66 |
| Patient H | 1/28/2015 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,506.47 |
| Patient Q | 2/2/2015 | SUBSYS | SUBSYS SPR 400MCG | LUBIN, EDWARD | $8,441.02 |
| Patient R | 2/3/2015 | SUBSYS | SUBSYS SPR 400MCG | LUBIN, EDWARD | $5,991.49 |
| Patient S | 2/4/2015 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,522.54 |
| Patient T | 2/9/2015 | SUBSYS | SUBSYS SPR 800MCG | LUBIN, EDWARD | $10,886.87 |
| Patient U | 2/9/2015 | SUBSYS | SUBSYS SPR 200MCG | LUBIN, EDWARD | $5,522.54 |

168.    The claims detailed in this Complaint are merely examples of the numerous claims Dr. Lubin submitted or caused to be submitted to Medicare and TRICARE.

169.    As a result, the United States has suffered actual damages in an amount to be determined at trial, plus civil penalties for each violation.

### FIRST CAUSE OF ACTION
False Claims Act: Presentation of False Claims
31 U.S.C. § 3729(a)(1)(A)

170.    The United States repeats and realleges the allegations contained in paragraphs 1 through 169 as if fully set forth herein.

171.    This is a claim for treble damages and civil penalties for each violation

of the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

172.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Dr. Lubin knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

173.   These include claims where Dr. Lubin solicited or received illegal kickbacks in return for prescribing Subsys to patients in exchange for speaker payments from Insys.

174.   These include claims where Dr. Lubin caused pharmacies to present false claims to federal healthcare programs that were false because they were not medically necessary or were tainted by illegal kickbacks.

175.   Dr. Lubin presented, and caused to be presented, these false claims with actual knowledge of their falsity, or with deliberate ignorance or reckless disregard of the truth or falsity of the claims.

176.   As a result, the United States has suffered actual damages in an amount to be determined at trial, plus civil penalties for each violation.

**SECOND CAUSE OF ACTION**
False Claims Act: Making and Using False Records
and Statements to Get False Claims Paid
31 U.S.C. § 3729(a)(1)(B)

177.   The United States repeats and realleges the allegations contained in paragraphs 1 through 169 as if fully set forth herein.

178.   As more fully alleged in the above paragraphs, Dr. Lubin knowingly

47

made and used, or caused to be made and used, false records and statements, including forms CMS-1500 and 837P, to get false and fraudulent claims paid by the United States for Subsys that were not medically necessary or improperly tainted by kickbacks and therefore ineligible for payment.

179.   As more fully alleged in the above paragraphs, Dr. Lubin made and used these false records and statements, or caused these false records and statements to be made and used, for which he sought and received reimbursement from Medicare and TRICARE.

180.   By virtue of the false records and statements that Dr. Lubin made and used, or caused to be made and used, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## THIRD CAUSE OF ACTION
### Common Law Fraud

181.   The United States realleges and incorporates by this reference preceding paragraphs 1 through 169 of this complaint as if fully set forth herein.

182.   Dr. Lubin made material and false representations with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentation to its detriment.  The United States acted in justifiable reliance upon Dr. Lubin's misrepresentations by making payments on false claims.

183.   Had the true facts been known to the United States, the United States

48

would not have paid the false claims for Subsys prescriptions.

184.   As a consequence of the acts set forth above, the United States was damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against the Defendant, Dr. Edward Lubin, as follows:

I.      On the First Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.      On the Second Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

III.     On the Third Count for common law fraud, for the amount of the United States' damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

                              Respectfully Submitted,

                              KARIN HOPPMANN
                              Acting United States Attorney

              by:    /s/ Jeremy R. Bloor
                              JEREMY R. BLOOR
                              Assistant U.S. Attorney
                              Florida Bar No. 0071497
                              Office of the United States Attorney
                              Middle District of Florida
                              400 West Washington St., Suite 3100
                              Orlando, FL 32801
                              Tele. (407) 648-7500
                              Fax (407) 648-7588
                              Jeremy.Bloor@usdoj.gov